UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

MICHAEL RECH,
        Plaintiff

-vs-

THE CITY OF BATAVIA, THE CITY
OF BATAVIA POLICE DEPARTMENT,
SGT. THAD MART, DET. CZORA,
OFFICER DeFREZE and OFFICER
LAWRENCE,
        Defendants

DECISION AND ORDER

15-CV-6732 CJS

_____

INTRODUCTION

In this action Plaintiff asserts claims for false arrest and excessive force under 42 U.S.C. § 1983 ("Section 1983"). Now before the Court is Defendants' motion for summary judgment (Docket No. [#24]). The application is granted and this action is dismissed.

BACKGROUND

The reader is presumed to be familiar with the record on summary judgment, therefore the Court will summarize the facts relevant to Defendants' summary judgment motion.

On September 30, 2013, Sergeant David Marcucci ("Marcucci") of the Town of Ogden Police Department filed criminal charges in the Town of Ogden Court against Plaintiff Michael Rech. The accusatory instrument is not contained in the record, but it is undisputed that it accused Plaintiff of Criminal Mischief in the Third Degree in violation of Penal Law § 145.05[2] (Class E Felony), Menacing in the Second Degree in violation of

1

Penal Law § 120.14, and (Class A Misdemeanor), and two counts of Attempted Assault in the Second Degree in violation of Penal Law § § 110.00 & 120.05[2] (Class E Felonies). The charges stemmed from an incident in which Plaintiff was alleged to have used an axe handle to poke and threaten a process server who was attempting to serve papers on him concerning a matrimonial action,[1] though Plaintiff maintains that the allegations by the process server were false.[2]  That same day, Marcucci spoke with Plaintiff by telephone, advised him that the charges had been filed, and asked him to come to the Ogden Police Department to discuss the matter.  Plaintiff told Marcucci that he would not speak to police without an attorney present.  Marcucci told Plaintiff that if Plaintiff did not voluntarily come to the Ogden Police Department, Marcucci would obtain a warrant for Plaintiff's arrest.

The following day, October 1, 2013, Marcucci applied for and obtained a warrant for Plaintiff's arrest from Ogden Town Court.  Additionally, Marcucci learned that Plaintiff would be at the Batavia Police Department the following day, October 2, 2013, at 7:00 p.m., to deliver custody of Plaintiff's child to the child's mother, as part of a pre-arranged procedure established between Plaintiff and the mother.  Marcucci then contacted the Batavia Police Department and arranged to have the Batavia Police Department arrest Plaintiff pursuant to the warrant while Plaintiff was at the Batavia Police Department for the custody exchange.  In this regard, Marcucci spoke with defendant Sergeant Thad Mart ("Mart") of the Batavia Police Department, and provided Mart with a copy of the criminal complaint against Plaintiff, a copy of the arrest warrant, a photograph of Plaintiff

---

[1] Docket No. [#24-10] at p. 2.
[2] Docket No. [#28-2] at pp. 42-45.

and a description of Plaintiff's car.[3] Additionally, Marcucci advised Mart that Plaintiff had a pistol license, that Plaintiff was known to own pistols, shotguns and rifles, and that Plaintiff was "known to keep weapons in his vehicle."[4]

The following day, October 2, 2013, at approximately 7:00 p.m., Plaintiff arrived at the Batavia Police Department as planned and transferred custody of his son to the child's mother in the parking lot of the Police Department. Specifically, Plaintiff got out of his car, removed his son from the child's car seat, walked the child the child's mother, and then got back into his car.[5] As the custody exchanged transpired, officers of the Batavia Police Department, consisting of Mart, Detective Kevin Czora ("Czora"), Officer Mark Lawrence ("Lawrence") and Officer James DeFreze ("DeFreze") were in patrol cars, observing the exchange at a distance.[6] Once the custody exchange was completed, the officers immediately drove up to Plaintiff's car in three police cars with their emergency lights activated, and boxed Plaintiff's car into its parking spot.[7]

What happened subsequently was fortuitously recorded by a dashboard camera ("dashcam") in Plaintiff's car.[8] As the patrol cars approached with their emergency lights activated, Plaintiff, who was seated in the driver's seat of his car, stated aloud to himself, "Here we go." Officers outside Plaintiff's car then repeatedly shouted commands to Plaintiff, including "Get out of the car," "Step out of the vehicle with your hands up, now! You're under arrest," and "Sir, you are under arrest." The dashcam recording indicates that the officers' commands were clearly audible inside Plaintiff's car, even though the car

---

[3] Docket No. [#24], Exhibit F at p. 11.
[4] Docket No. [#24-7] at p. 15 (Marcucci trial testimony).
[5] Docket No. [#24-8] at pp. 4-6 (Plaintiff's testimony).
[6] Docket No. [#24], Exhibit F at p. 33.
[7] Docket No. [#24-7] at p. 35 (Mart trial testimony).
[8] *See,* Manually Filed Exhibit to Docket No. [#29].

3

doors were shut and the windows were raised. Plaintiff admits that the officers yelled at him but contends that he cannot recall exactly what they were saying because he was "concentrated on making phone calls."[9] Plaintiff acknowledges, though, that the officers may have indicated that he was being arrested pursuant to a warrant. *See*, Docket No. [#24-8] at p. 13 ("I think they just said there was a warrant. I don't remember the details.").

It is undisputed that after the four officers surrounded Plaintiff's car with their patrol cars, they each drew their pistols and pointed them at Plaintiff, while Mart and Czora continued issuing verbal commands for Plaintiff to get out of the car.[10] As the officers were issuing these commands, Plaintiff remained seated in the driver's seat of his car, with the windows raised and the doors locked.[11] Mart has testified that as he approached Plaintiff's car, he "observed [Plaintiff] reach with his right hand over to his left side with his hands out of view."[12] Mart testified that as the incident progressed, he saw Plaintiff holding a cell phone in front of his face[13] with one hand, but could not see Plaintiff's other hand.[14] Czora has similarly testified that he was unable to see Plaintiff's hands at all times as Plaintiff sat in his car, and that Plaintiff refused to comply with demands that he

---

[9] Docket No. [#24-8] at p. 10 (Plaintiff's testimony); *see also, id.* at . 11 ("I was concentrating on making phone calls."); *id.* at p. 12 ("I don't recall specifically [what the officers were saying.] Again, I was focusing on identifying to people I knew that they knew where I was." [sic]). The Court observes that during Plaintiff's deposition, he claimed to have almost no useful recall of the events surrounding this action. Indeed, Plaintiff claimed that he could not recall how to spell his ex-wife's name.
[10] Docket No. [#24-7] at pp. 83-84 (Lawrence trial testimony).
[11] Plaintiff's Complaint admits that Plaintiff's car doors were locked. *See*, Complaint at ¶ 19. At oral argument, Plaintiff's attorney asserted that there is no evidence that Plaintiff locked the car doors *after* the officers first ordered him out of the car. Nevertheless, it is undisputed that the doors of the car were in fact locked, which means that they became locked at some point after Plaintiff got back into his car after transferring custody of his child to the child's mother. *See*, Docket No. [#24-7] at p. 60 (Mart testified that the car doors were locked, but that he did not observe Plaintiff lock them.)
[12] Docket No. [#24-7] at pp. 37, 53.
[13] Docket No. [#24-7] at p. 42.
[14] Docket No. [#24-7] at pp. 42, 54.

show his hands.[15] The testimony by the officers on this point is uncontroverted.[16] However, the officers never observed Plaintiff with a weapon.

The defendant officers continued issuing verbal commands to Plaintiff for approximately 42 seconds, after which Plaintiff made a cellular telephone call to his mother.[17] (The conversation was recorded by the dashcam, as Plaintiff's phone was on the "speaker" setting). Plaintiff told his mother that he needed her to come to the Batavia Police Department, because he was being arrested. In that regard, Plaintiff stated, "They're gonna arrest me" and "They say I'm under arrest." That call ended approximately one minute and forty-two seconds into the standoff between Plaintiff and the Police. Approximately ten seconds later, Plaintiff made a second telephone call, in which he attempted to reach his attorney.[18] As the phone was dialing, Plaintiff stated aloud, "Gimme one second." (The officers deny that they heard Plaintiff say anything, but they acknowledge that Plaintiff made a gesture with his finger as if to say, "Give me one second."). Approximately twenty seconds after Plaintiff said "Gimme one second," he was still on the telephone, at which time an officer again yelled, "Out of the vehicle."

Almost immediately thereafter, Detective Czora broke the driver's window of Plaintiff's car using a collapsible baton.[19] According to the audio of the dashcam recording, Czora broke the window approximately two minutes and thirty-two seconds

---

[15] Docket No. [#24-7] at pp. 66, 74-75.
[16] At oral argument, Plaintiff's counsel asserted that the officers did not need to break Plaintiff's car window because they could see his hands and could therefore see that he did not have a weapon. However, the record on summary judgment contains both Plaintiff's deposition transcript [#28-3] and an affidavit from Plaintiff [28-4], and neither document controverts the officers' statements that Plaintiff refused to show his hands when ordered to do so, and that his hands were out of sight at certain times.
[17] Docket No. [#24-8] at p. 9.
[18] Docket No. [#24-8] at p. 9.
[19] The dashcam recording contains the sound of the breaking glass, but not capture video of the incident, as it was facing the front of Plaintiff's car.

5

after the Officers first ordered Plaintiff out of his car. When asked at deposition why he broke the car window, Czora responded: "Well, you've got four officers with firearms drawn. You've got a noncompliant subject who's wanted for violent felony offenses who may be in possession of weapons. You've got public in the area. And with all that considered, I felt it was necessary to end the situation as quickly as possible." Docket No. [#24-9] at p. 7.

After Czora broke the car window, he and DeFreze unlocked and opened Plaintiff's door, pulled Plaintiff from the car,[20] placed Plaintiff in a prone position face down on the pavement and handcuffed Plaintiff. The officers then observed that Plaintiff had sustained abrasions and a laceration to the left side of his neck, evidently caused by flying window glass. The officers summoned an ambulance, and Plaintiff was taken to the hospital, where he received treatment. The doctor who treated Plaintiff reported that Plaintiff sustained "abrasions" and a "small laceration" to the left side of his neck that required two sutures.[21] After Plaintiff received treatment, Marcucci transported him back to the Town of Ogden.

Subsequently, on October 9, 2013, Mart charged and arrested Plaintiff with having resisted arrest during the incident on October 2, 2013, in violation of New York Penal Law § 205.30.[22] That same day, Plaintiff was arraigned in Batavia City Court and released on his own recognizance. Plaintiff moved to have the accusatory instrument dismissed as defective, pursuant to New York Criminal Procedure Law § § 170.30 &

---

[20] Docket No. [#24-7] at p. 39.
[21] See, Docket No. [#24-11] at . 18, Medical record ("Wound Type ABRASIONS W/ SMALL LACERATION"); see also, Docket No. [#24], Exhibit F at p. 87; see also, Docket No. [#24-11] at p. 13, (Medical record indicating that Plaintiff received two sutures).
[22] Docket No. [#24-10] at p. 3.

6

170.35. In that regard, Plaintiff asserted that, "[i]n merely delaying the inevitable by allegedly remaining seated during the arrest process, [he] did not 'attempt to prevent' [his] arrest within the meaning of the resisting arrest statute."[23] However, Batavia City Court denied that application. Plaintiff was subsequently acquitted of resisting arrest, following a jury trial in Batavia City Court.

On December 9, 2015, Plaintiff commenced this action. On June 14, 2019, Defendants filed the subject motion [#24] for summary judgment. On October 21, 2019, Plaintiff filed a response [#28]. On November 20, 2019, Defendants filed their reply [#29]. On December 29, 2020, counsel for the parties appeared before the undersigned for oral argument.

DISCUSSION

*Rule 56*

Defendants have moved for summary judgment pursuant to Fed. R. Civ. P. 56. Summary judgment may not be granted unless "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). "[T]he movant must make a *prima facie* showing that the standard for obtaining summary judgment has been satisfied." 11 MOORE'S FEDERAL PRACTICE, § 56.11[1][a] (Matthew Bender 3d ed.). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence

---

[23] Docket No. [#24], Exhibit K at p. 7.

7

to support an essential element of the nonmoving party's claim." *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir.1996) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)), *cert denied*, 517 U.S. 1190 (1996).

The burden then shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To do this, the non-moving party must present evidence sufficient to support a jury verdict in its favor. *Anderson*, 477 U.S. at 249. The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993).

<u>Most of Plaintiff's Claims Are Deemed Abandoned</u>

Where a party moves for summary judgment and the opposing party responds but fails to address particular challenged claims, the court may deem those claims to have been abandoned. *See, Page v. Half Hollow Hills Cent. Sch. Dist.*, No. 16CV4710SJFGRB, 2019 WL 764748, at *7 (E.D.N.Y. Feb. 20, 2019) ("In this Circuit, 'in the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition [to summary judgment] that relevant claims or defenses that are not defended have been abandoned.' *Jackson v. Fed. Express.*, 766 F.3d 189, 198 (2d Cir. 2014); *accord Kovaco v. Rockbestos-Surprenant Cable Corp.*, 834 F.3d 128, 143 (2d Cir. 2016) (hostile work environment claims deemed abandoned where plaintiff "fail[ed] to argue that

8

they should survive [defendant's] motion for summary judgment" while arguing against the motion as to his other claims).").[24]

In this action Plaintiff's Complaint [#1] purports to state nine causes of action, but the sixth cause of action is missing. Accordingly, the Complaint asserts eight causes of action, which are as follows: 1) Section 1983 (excessive force during arrest on felony warrant; arrest and prosecution without probable cause on charge of resisting arrest); 2) assault and battery; 3) intentional infliction of emotional distress ("IIED"); 4) negligent infliction of emotional distress ("NIED"); 5) false arrest; 7) malicious prosecution; 8) "respondeat superior liability"; and 9) "negligent supervision and training." The first cause of action purportedly arises under federal law, 42 U.S.C. § 1983, while the remaining claims expressly or impliedly arise under the law of the State of New York.[25]

Defendants' summary judgment motion contends that Plaintiff's claims for assault and battery, false arrest, malicious prosecution, IIED and NIED should be dismissed as being either time-barred or lacking merit. Further, Defendants contend that Plaintiff's eighth and ninth causes of action ("respondeat superior liability" and "negligent supervision and training") also lack merit. Plaintiff's response [#28-5] fails to address those arguments, and instead focuses on just two points: "[T]hat the [individual]

---

[24] *See also, Marache v. Akzo Nobel Coatings, Inc.*, No. 08 CIV. 11049 SHS/AJ, 2010 WL 908467, at *15 (S.D.N.Y. Mar. 12, 2010) ("Akzo moved for summary judgment on that claim. Marache failed to respond (or even mention) this claim in his opposition brief to Akzo's summary judgment motion. Therefore, Marache's design defect claim should be dismissed as abandoned.") (collecting cases); *Ramos v. Town of E. Hartford*, No. 3:16-CV-166 (VLB), 2019 WL 2785594, at *22 (D. Conn. July 2, 2019) ("To the extent that Ramos alleges a negligence claim, other than the negligence claim against Defendant Lis for spraying him with pepper spray prior to his arrest, the Court deems it abandoned and grants Defendants' Motions for Summary Judgment on that claim.").

[25] Defendants apparently construe Plaintiff's ninth cause of action as "a *Monell* claim for inadequate training and supervision." Defs. Memo of Law at p. 3. However, *Monell* liability is a theory of municipal liability under federal law (Section 1983), and Plaintiff's ninth cause of action expressly states only that it arises under the "statutory and common law rights as guaranteed by the laws and Constitution of the State of New York." Complaint at ¶ 61.

defendants used excessive force during their arrest of [Plaintiff] on October 2, 2013 and additionally, they lacked probable cause to arrest him for the crime of Resisting Arrest, also alleged to have occurred on that date," in violation of Plaintiff's Fourth Amendment rights. Consequently, the Court finds that Plaintiffs has abandoned his state-law claims for assault and battery, false arrest, malicious prosecution, IIED, NIED, respondeat superior liability and negligent supervision and training, and those claims are accordingly dismissed with prejudice. As Plaintiff's eighth and ninth causes of action (respondent superior, negligent training and supervision) were the only claims asserted against the City of Batavia and the City of Batavia Police Department, those defendants are dismissed from the action.[26]

*Section 1983*

Section 1983 "is not itself a source of a substantive rights, but merely provides a method for vindication of federal rights elsewhere conferred." *Long v. Crowley*, No. 09BCVB00456A(F), 2012 WL 1202181 (W.D.N.Y. Mar. 22, 2012) (citations and internal quotation marks omitted). To establish individual liability under Section 1983, a plaintiff must show that the defendant acted under color of state law and caused the plaintiff to be deprived of a constitutional right. 42 U.S.C. § 1983.[27]

---

[26] The City of Batavia Police Department would have been dismissed from the action in any event, as the claims against it are redundant of the claims asserted against the City of Batavia. *See, e.g., Casaccia v. City of Rochester*, No. 6:17-CV-06323-MAT, 2018 WL 324420, at *4 (W.D.N.Y. Jan. 8, 2018) ("Pursuant to Federal Rule of Civil Procedure 17(b)(3), the capacity of local law enforcement agencies to sue or be sued is determined by reference to New York law. Under New York law, departments which are merely administrative arms of a municipality have no separate legal identity apart from the municipality and therefore cannot sue or be sued, and a police department is an administrative arm of the municipal corporation."); *accord, Pierre v. City of Rochester*, 16-CV-6428 CJS, 2018 WL 10072453 at *10 (W.D.N.Y. Sep. 7, 2018).

[27] The opening paragraph of Plaintiff's Complaint [#1] refers to violations of Plaintiff's rights under the "First, Fourth and Fourteenth Amendments." However, the reference to the First Amendment appears to have been in error, as there is no other indication that Plaintiff is actually pursuing a First Amendment claim, nor does there appear to be any basis for such a claim.

*Fourth Amendment False Arrest*

Plaintiff contends that he was improperly arrested in violation of his Fourth Amendment rights. The Complaint alleges two instances of unconstitutional arrest: First, when Plaintiff was arrested on October 2, 2013; and second, when Plaintiff was arrested on October 9, 2013. *See*, Complaint [#1] at ¶ ¶ 32-33 (Asserting that the arrest pursuant to the warrant on October 2, 2013 "was done without lawful justification or reason," and that "[i]n addition, the arrest and prosecution of the plaintiff for the crime of Resisting Arrest was done without probable cause[.]"). However, at oral argument, Plaintiff's counsel conceded that the first arrest, pursuant to the warrant from the Town of Ogden Court, was justified. Accordingly, the only Fourth Amendment false arrest claim concerns the arrest on October 9, 2013, for resisting arrest.

The Fourth Amendment protects persons from unreasonable *seizures*, including but not limited to arrests without probable cause. *See, Williams v. City of New York*, 683 F. App'x 57, 58 (2d Cir. 2017) (Indicating that claims for false arrest under section 1983 rest "on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause.") (citation omitted).

> An officer has probable cause to arrest where he is in possession of reasonably trustworthy information concerning facts and circumstances sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime. This standard is a practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. Because the standard is fluid and contextual, a court must examine the totality of the circumstances surrounding a given arrest. In doing so, we consider the circumstances from the perspective of an objectively reasonable police officer, recognizing that the officer is entitled to draw reasonable inferences on the basis of his prior experience.

11

*United States v. Pabon*, 871 F.3d 164, 174 (2d Cir. 2017) (citations and internal quotation marks omitted).

The crime for which Plaintiff was arrested on October 9, 2013, was "resisting arrest," in violation of New York Penal Law § 205.30 which states: "A person is guilty of resisting arrest when he intentionally prevents or attempts to prevent a police officer or peace officer from effecting an authorized arrest of himself or another person." To violate this statute, the defendant must have reason to know that he is being arrested. *See, e.g., In re Victoria W.*, 35 Misc. 3d 1221(A), 953 N.Y.S.2d 554 (Fam. Ct. 2012) ("Where the circumstances are ambiguous, there must be an indication given that an arrest is to be made, because an individual who is unaware that she is being arrested cannot intentionally resist arrest.") (citation and internal quotation marks omitted). Additionally, "[a] key element of resisting arrest is the existence of an authorized arrest, including a finding that the arrest was premised on probable cause." *People v. Jensen*, 86 N.Y.2d 248, 253, 654 N.E.2d 1237, 1240 (1995).

Merely remaining seated on the ground while an officer is attempting to make an arrest is not sufficient to constitute resisting arrest. *See, People v. Arbeiter*, 169 Misc.2d 771, 773-774, 650 N.Y.S.2d 915, 917-918 (1st Dept. 1996) ("In merely delaying the inevitable by allegedly remaining seated during the arrest process, defendants did not attempt to prevent their arrest within the meaning of the resisting arrest statute as presently constituted. . . . so long as the defendant does not affirmatively act to resist the arrest[.]"). On the other hand, to violate the statute a defendant need only engage in "some conduct" with the intent of preventing an officer from effecting an authorized arrest:

> [T]he resisting arrest statute does not require the People to show "'that a defendant use[d] "force or violence" in obstructing the officer. It is enough

12

> that [the defendant] engage in some conduct with the intent of preventing the officer from effecting an authorized arrest of himself or another person.'" *People v. Stevenson*, 31 N.Y.2d 108, 112, 335 N.Y.S.2d 52, 286 N.E.2d 445 (1972) (quoting Denzer & McQuillan, Practice Commentary, McKinney's Cons.Laws of N.Y., Book 39, Penal Law § 205.30, at 677). As a matter of common sense, chaining oneself to a steel pipe will prevent an officer from effectuating an arrest until one can be unchained.
>
> The decisions in *People v. Arbeiter*, 169 Misc.2d 771, 650 N.Y.S.2d 915 (App. Term 1st Dep't 1996), app. denied, 89 N.Y.2d 918, 654 N.Y.S.2d 720, 677 N.E.2d 292 (1996), *cert. denied*, 520 U.S. 1213, 117 S.Ct. 1698, 137 L.Ed.2d 824 (1997), and *People v. McDaniel*, 154 Misc.2d 89, 593 N.Y.S.2d 154 (App. Term 2d Dep't 1992), *app. denied*, 81 N.Y.2d 889, 597 N.Y.S.2d 950, 613 N.E.2d 982 (1993), do not mandate a contrary result. In *Arbeiter*, the defendants merely "remain[ed] seated during the arrest process." The court's dismissal of the accusatory instrument in that case rested on the Court's view that "the provisions of the Penal Law § 205.30 simply do not cover the type of inaction attributed to these defendants." 169 Misc.2d at 774, 650 N.Y.S.2d 915 (emphasis added). *But see People v. Bauer*, 161 Misc.2d 588, 614 N.Y.S.2d 871 (City Ct. Watertown 1994) (intentional act of remaining seated and refusing to walk during an arrest constitutes resisting arrest). *Arbeiter* is inapposite because the allegations here do not involve "inaction" but instead the defendant's affirmative act of chaining herself to a steel pipe.

*People v. Berardi*, 180 Misc. 2d 922, 925, 690 N.Y.S.2d 916, 918 (Crim. Ct. 1999); *see also, Reid v. City of New York*, 736 F. Supp. 21, 24 (E.D.N.Y. 1990) ("Plaintiff admitted in her deposition that she interfered in her son's arrest by stepping in front of Dorsty and waiving her arms, as the officer rushed to assist in the arrest. [The arrest was also authorized.] Thus, Dorsty had probable cause to arrest the plaintiff for resisting the authorized arrest of her son.").

In the instant case, the Court notes at the outset that the defendant officers were clearly authorized to arrest Plaintiff on October 2, 2013, pursuant to the arrest warrant issued by the Town of Ogden Court. As mentioned earlier, at oral argument Plaintiff's

13

counsel admitted that the officers were entitled to arrest Plaintiff pursuant to that warrant. Further, Plaintiff's statements to his mother that were recorded on his dashcam clearly establish that he understood that the officers were attempting to arrest him.

Additionally, it is clear from the record that Plaintiff engaged in some affirmative conduct with the intent of preventing the officers from effecting an authorized arrest. Specifically, Plaintiff remained inside of his locked vehicle, while ignoring the officers' commands that he show his hands and come out of the car. In the Court's view, such action is akin to chaining oneself to a pipe, as occurred in *People v. Berardi*. Conversely, Plaintiff's conduct is unlike the "inaction" of the protesters in *Arbeiter* who merely remained seated on the ground. By sitting on the ground, the protesters in *Arbeiter* made it more difficult for the police to arrest them, but it did not prevent the arrest. Here, by choosing to remain inside his locked car, Plaintiff ensured that the officers could not arrest him without first gaining entry into his locked car.

On this point, the Court believes it is irrelevant whether Plaintiff locked the doors of his car before or after he realized that the officers intended to arrest him. At oral argument, Plaintiff's counsel indicated that such timing matters, and that there is no evidence that Plaintiff locked the doors after the officers first surrounded his car. Counsel stated words to the effect that if Plaintiff had locked the doors upon the approach of the officers, "we would have a different case." The Court disagrees. First, the dashcam recording establishes that the officers' initiation of the arrest, by surrounding Plaintiff's car with their patrol cars, occurred almost simultaneously with Plaintiff getting back into his car after transferring custody of his son. Consequently, there was no distinct period prior to the arrest during which Plaintiff might have innocently locked his doors. Moreover,

Plaintiff maintains that his car's engine was turned off at the time,[28] which makes it unlikely that the car doors locked automatically. Regardless, the Court views Plaintiff's affirmative resistance as being his act of remaining inside the locked vehicle, thereby preventing the arrest from taking place.

For these reasons, the Court finds as a matter of law that the defendant officers had probable cause to arrest Plaintiff for resisting arrest. Defendants are therefore entitled to summary judgment on Plaintiff's Fourth Amendment False Arrest Claim.[29]

*Fourth Amendment Excessive Force*

Plaintiff's remaining claim is that "Mart, Czora, DeFreze and Lawrence, acting in concert," subjected him to excessive force during the arrest on October 2, 2013.[30] During oral argument, Plaintiff's counsel emphasized, in sum and substance, that the excessive force consisted of breaking the driver's window and forcibly removing Plaintiff from the car, when there were "a lot of other things" that the officers could have done instead, such as waiting for Plaintiff to finish making his telephone calls or breaking a window farther away from Plaintiff's head.

The legal principles applicable to Fourth Amendment excessive force claims may be summarized as follows:

> "[C]laims that law enforcement officers have used excessive force ... in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is

---

[28] Docket No. [#24-8] at p. 7 (Plaintiff believes the car was not running).
[29] To the extent that Plaintiff was also attempting to assert a Fourth Amendment malicious prosecution claim, the existence of probable cause is fatal to such a claim.
[30] Complaint [#1] at ¶ 32.

15

necessary in a particular situation." *Id.* at 396-97, 109 S.Ct. 1865. Factors relevant to the determination of whether the government intruded too far on a suspect's Fourth Amendment rights include the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of the officers or others, and whether the suspect was actively resisting arrest. *Brown v. City of New York*, 798 F.3d 94, 100 (2d Cir. 2015) (citing *Graham v. Connor*, 490 U.S. at 396, 109 S.Ct. 1865). "Defendants are liable as long as the force used exceeded the force needed for the factual circumstances and the fact that Plaintiff may not have sustained serious long lasting harm is not dispositive." *Graham v. City of New York*, 928 F.Supp.2d 610, 618 (E.D.N.Y. 2013); *see also Lemmo v. McKoy*, No. 08-CV-4264 (RJD), 2011 WL 843974, at *5-6 (E.D.N.Y. Mar. 8, 2011) (collecting cases in which courts have both permitted and dismissed excessive force claims predicated on *de minimis* injury). While "not every push or shove constitutes excessive force," *Lennon v. Miller*, 66 F.3d 416, 426 (2d Cir. 1995) (citing *Graham v. Connor*, 490 U.S. at 396, 109 S.Ct. 1865), a show of force by an officer that is grossly disproportionate to the risk of harm, as determined by the *Graham v. Connor* factors, may support a claim for excessive force.

"That multi-factor test is not meant to be applied rigidly, however, and the inquiry into whether force is reasonable requires an objective examination of the totality of the circumstances." *Gersbacher v. City of New York*, No. 14-CV-7600 (GHW), 2017 WL 4402538, at *9 (S.D.N.Y. Oct. 2, 2017) (internal quotation marks omitted). The "reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 100. "[G]ranting summary judgment against a plaintiff on an excessive force claim is not appropriate unless no reasonable factfinder could conclude that the officers' conduct was objectively unreasonable." *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 123 (2d Cir. 2004) (Sotomayor, J.).

*Othman v. City of New York*, No. 13CV4771NGGSJB, 2018 WL 1701930, at *5 (E.D.N.Y. Mar. 31, 2018).

Applying the factors set forth above and considering the totality of circumstances, the Court notes that the following facts are undisputed: 1) the officers were entitled to arrest Plaintiff pursuant to a valid arrest warrant; 2) the officers were aware that Plaintiff was accused of violent felonies in Ogden Town Court, and they had been advised by Sergeant Marcucci that Plaintiff owned several firearms, some of which might have stored

16

in Plaintiff's car; 3) the incident occurred on October 2, 2013 shortly after 7:00 p.m., at dusk; 4) the officers loudly and clearly announced that Plaintiff was under arrest, and Plaintiff understood that the officers intended to arrest him; 5) the officers clearly and repeatedly ordered Plaintiff to get out of the locked car, but he ignored their demands; 6) the officers clearly and repeatedly ordered Plaintiff to show his hands, but he did not do so; 7) the situation was essentially a standoff in a municipal parking lot in the City of Batavia, with Plaintiff inside of a locked car, surrounded by three patrol cars and four officers with their weapons drawn; 8) rather than showing his hands and/or coming out of the car, Plaintiff made multiple telephone calls over a period of two minutes and thirty-two seconds; 9) while Plaintiff was using the telephone the officers could see his hand holding the phone but could not see his other hand; 10) the only attempt that Plaintiff made to communicate with the officers was when he held up a finger to signal "just a second," but he was still talking on his telephone more than twenty seconds later when Czora decided to break the window; and 11) Czora articulated a number of tactical reasons why he believed that the situation was unsafe and needed to be ended as quickly as possible and why he chose to break the window closest to Plaintiff.

Based on all of the foregoing, the Court finds as a matter of law that the officers did not act unreasonably in accomplishing Plaintiff's arrest. Rather, the Court finds that the officers acted reasonably in breaking Plaintiff's window. In this regard the Court agrees with the reasoning expressed in *Woods v. Arizona Dept. of Public Safety*, No. CV-13-00746-PHX-JJT, 2016 WL 537584 at *3, n. 4 (D.Ariz. Feb. 11, 2016), wherein the district court stated:

> The Court must answer a preliminary question before it delves into the specific situation where Plaintiff might be harmed by a baton strike intended

17

> to shatter a window. The question is whether Defendant Maksimuk had a right to break Plaintiff's car window to gain access to Plaintiff in the first place. The question is easily answered, however. A police officer is entitled to use reasonable and necessary force to affect an arrest. *See Graham v. Connor*, 490 U.S. 386, 395-96 (1989). When police officers have probable cause to arrest an individual, and that individual has sought to avoid them by locking himself inside a car, refusing a lawful order to come out, and showing at least verbal hostility, the officers are entitled to use reasonable force to gain entry to the car for the purposes of making the arrest.

*see also, Ickes v. Grassmyer*, 704 Fed.Appx. 190, 193 (3d Cir. Jul. 28, 2017) (Under totality of circumstances, which suggested that the plaintiff-motorist posed a threat, officers did not use excessive force to arrest plaintiff, where they "shattered the front-passenger-side window, unlocked the door," "pulled Ickes out" of the car, "pulled [Ickes] through broken glass and then tackled [Ickes] onto the concrete driveway."); *Gutierrez v. City of New York*, No. 13 Civ. 3502 (JGK), 2015 WL 5559498 at *7-8 (S.D.N.Y. Sep. 21, 2015) (When a motorist, Vera, suspected of a vehicle and traffic offense, refused officers' demands to get out of car and instead remained inside car making telephone calls, officers broke Vera's window and used pepper spray, some which contacted the plaintiff-passenger, Gutierrez; in dismissing Gutierrez's excessive force claim, the Court observed that "[t]he officers were reasonably attempting to effect an arrest of Vera who refused to open the window or door of the car and to exit the car.") (Koeltl, J.); *Buckley v. Niagara Frontier Transportation Authority*, 13-CV-1205-RJA-MJR, 2016 WL 8673590 at *7 (W.D.N.Y. Jul. 22, 2016) ("A police officer's right to carry out an arrest necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.") (citing *Gutierrez v. City of New York*; other citations omitted); *Guerrero v. Dillard*, 5-17-CV-925-RBF, 2019 WL 1299506 at *6 ("[B]ecause of [the plaintiff's] ongoing attempts to free her vehicle and refusal to get out of the car when ordered, the deputies' decision to

18

break the car window and forcibly remove her was sensible, not excessive or unreasonable."); *c.f., Plummer v. District of Columbia*, 317 F.Supp.3d 50, 65 (D.D.C. Jun. 20, 2018) ("The evidence in the record shows only that police instructed Plummer to exit his vehicle, that they broke his car window after he repeatedly refused, that the removed him from the vehicle, and that they may have damaged his garage door when they prevented it from closing on them. This proportionate use of force incident to Plummer's arrest cannot support an IIED claim."); *but see, Davis v. Clifford*, 825 F.3d 1131 (10th Cir. 2016) (Police officer used excessive force where, in connection with an arrest for relatively minor offense, when driver did not immediately exit her vehicle when ordered to do so the officer broke driver's window, grabbed driver by her hair and arms, "pulled her through the shattered window" (rather than opening the door) and "pinned her face down on the broken glass outside the car.").

Although the defendant officers' use of force caused some minor incidental injury to Plaintiff, such fact by itself is not sufficient to establish that the officers acted unreasonably. *See, e.g., Brant v. Volkert*, 72 F. App'x 463, 466 (7th Cir. 2003) ("Brant claimed only that he sustained injury as a result of the arrest, but he cannot show simply by the fact of injury by itself that the officers' conduct was unreasonable. *See Brownell v. Figel*, 950 F.2d 1285, 1293 (7th Cir.1991)."). There is no evidence in the record that the injury to Plaintiff's neck from broken glass was intentional. Rather, it seems clear that Czora's intent in using the baton was to break the window, not to injure Plaintiff. The fact that a flying piece of glass unfortunately caused a small laceration to Plaintiff's neck does not transform the officers' otherwise reasonable conduct into a constitutional violation.

## CONCLUSION

Defendants' motion for summary judgment [#24] is granted and this action is dismissed. The Clerk of the Court is directed to enter judgment for Defendants and close this action.

SO ORDERED.

Dated: Rochester, New York
       February 3, 2020

ENTER:

/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge